UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

GERMAN YOVANI QUEZADA,

Petitioner,

v.

W.L. MUNIZ, Warden,

Respondent.

No.  2:17-cv-0243 DAD AC

FINDINGS AND RECOMMENDATIONS

Petitioner is a California state prisoner proceeding pro se with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  The action proceeds on a petition that challenges petitioner's 2012 conviction for attempted murder and related offenses.  ECF No. 4 at 4-100. Respondent has answered, ECF No. 19, and petitioner filed a traverse, ECF No. 27.

BACKGROUND

I.      Proceedings In the Trial Court

A.  Preliminary Proceedings

Petitioner and two co-defendants, Rolando Arismendez and Juan Manuel Reyes,[1] were charged in Yolo County with attempted premeditated murder, conspiracy to commit attempted

---

[1] Other participants in the underlying events were initially charged, see 1 Clerk's Transcript on Appeal ("CT") at 1-14 (complaint filed February 21, 2012, but did not proceed to trial with petitioner, Arismendez, and Reyes.

1    murder, criminal street gang activity, and related enhancements, all arising from a drive-by

2    shooting.  Petitioner was also charged with shooting at an inhabited dwelling.

3          B.  The Evidence Presented at Trial[2]

4             1.  Prosecution Case

5        The jury heard evidence of the following facts.  In October 2011, Jose Luis Delgado

6    Tarango (Delgado) was an active member in the Sureño criminal street gang.  That month,

7    Delgado posted his home address on Facebook "[j]ust to mock" members of a rival gang, the

8    Norteños.  Like most other Sureño gang members who lived in Woodland, California, Delgado

9    resided in a neighborhood called Yolano Village.  Delgado lived on Donnelly Circle and

10    considered himself a protector of his neighborhood.

11        At 3:00 p.m. on November 15, 2011, petitioner sent a text message to Arismendez stating,

12    "Can u get a whip, I almost got ran up on."  Woodland police detective John Perez explained a

13    "whip" refers to a car or transportation.  About two minutes later, Arismendez replied, "Got BMZ

14    car" -- referring to his "baby's mama['s]" car.  Yvette Adame, the mother of Arismendez's child,

15    owned a white Chevrolet Malibu with an orange "W" sticker on the rear windshield.  At almost

16    the same time, petitioner sent someone else a text message that he needed to find someone with a

17    license because he was "tryna mob around."

18        Around 5:00 or 6:00 p.m., Delgado received a phone call that some Norteños were driving

19    around his neighborhood.  Delgado and another Sureño got into their car and chased another car

20    containing five or six Norteños out of the Sureño territory of Yolano Village.  The car was white

21    and had an orange Woodland High School "W" sticker on it.  Delgado acknowledged that if he

22    had had a gun, he would have shot at the Norteños.  He and the other Sureño ended up chasing

23    them away.

24        Shortly after 10:00 p.m., petitioner sent a text message to Arismendez stating, "Clean the

25    clip and gun."  A few minutes later Arismendez replied, "Done."

26

27    [2]  This summary is adapted from the opinion of the California Court of Appeal, Lodged Doc. 42
at 1-10.  Though relatively lengthy, the facts are set forth in detail because the state of the

28    evidence as a whole is material to analysis of petitioner's claims for relief.

Casey Moore was 17 or 18 years old in November 2011.  After living in Indiana for a few years, Moore had recently returned to Woodland.  He knew Arismendez through his mother and a few of her friends.  Moore was interested in becoming a Norteño gang member and asked Arismendez about joining the gang.

During most of the day on November 15, 2011, Moore was hanging out with his friend Tomas Ramirez.  Ramirez drove a white Chevrolet Malibu.  Sometime in the late afternoon, Moore accompanied Ramirez in giving Ramirez's cousin a ride from Davis to Woodland.  When they ran low on gasoline, Moore called Arismendez to borrow money.  Arismendez agreed to give them gas money but said they would also have to give his cousin a ride.

Moore and Ramirez drove to an apartment complex in Woodland to meet Arismendez.  At the apartment complex, Arismendez introduced Moore and Ramirez to the person who lived there, Kalynn Rodriguez.  Rodriguez and Arismendez had been friends for about a year.  Inside Rodriguez's apartment, Moore watched Arismendez clean two guns and put them into a bag.  Arismendez's cousin, Reyes, showed up at the apartment.  Arismendez and Reyes talked about going to "fuck up some scraps."  Moore understood this to mean they were going to "jump" or "fight" a member of the Sureño gang.  Moore thought they were taking Reyes to fight someone.  For giving Reyes a ride, Ramirez received $20 for gas.

Ramirez, Moore, and Reyes drove to a gas station and purchased gas.  Reyes instructed them to pick up an additional passenger.  Ramirez and Moore drove to another apartment complex in Woodland and picked up petitioner.  They drove around for a while before stopping to let petitioner pick up some marijuana.  At petitioner's instruction, they drove to a house where they picked up a male who was never positively identified at trial.  The prosecution referred to this fifth passenger as JD Salas, a name used here for ease of reference.  Moore took over driving because Ramirez did not know his way around Woodland.  They drove around for a while.  Moore realized what they were doing when he "saw the guns" as they neared Sureño territory at Yolano Village.  The guns were the same ones Moore saw Arismendez put into a bag at the apartment.

Moore drove slowly down Donnelly Circle.  He saw a gun in Reyes's pocket and

observed as petitioner drew a snub-nose revolver.  Suddenly, Reyes, petitioner, and Salas started shooting out of the car.  Reyes fired from the front passenger seat, petitioner fired from the rear passenger window, and Salas sat on the doorframe and fired over the roof of the car.  Ramirez was leaning forward and covering his head.  The shooting lasted 10 to 15 seconds.

Delgado was standing in front of his house and talking with his neighbor, Jenny Morales.  Suddenly, "[b]ullets [were] flying everywhere."  Delgado saw a white car carrying four people, with the two passengers in the rear seats firing at him.  It was obvious to Delgado the bullets were coming from the car because it was the only one in the area.  He also saw a big spark coming from the car.  The car sped off.

Delgado did not have a gun when the shooting started.  However, he did have an Airsoft BB gun hidden in a nearby trash can.  Delgado kept the BB gun in an outside trash can because he feared the police would see him with it, think it was real, and shoot him.  Also, Delgado was on searchable probation and did not want to be caught with the BB gun.  Delgado retrieved the BB gun after the shooting was over.  Delgado's mother came out of the house and asked if he was all right.  She took the BB gun away and threw it into the trash.

Moore panicked when the shooting started.  At trial, he could not remember whether he hit the brakes or the gas pedal.  Reyes grabbed the steering wheel and asked, "What the fuck are you doing?"  No one had control over the car and it crashed through a fence.  The airbags deployed, and everyone got out and started running.  Moore heard petitioner say, "Fuck, I shot my hand . . . ."

Delgado heard the car crash and ran toward it.  The car had crashed, its doors stood open, and police officers surrounded it.  Delgado turned to run to a friend's house, but the police caught him.

On the evening of the shooting, Woodland Police Officer Matthew Gray was on duty when he heard about eight gunshots followed by the sound of tires skidding.  A few minutes later, Officer Gray found a white Chevrolet Malibu abandoned in Gonzalez Park, near Delgado's residence.  The car had crashed through a fence and come to rest in the bark chips of a children's play area.  Woodland City Police Officer Francisco DeLeon arrived to find the car's lights were

on, the engine running, and the airbags deployed.  The rear driver's side window was broken, and the front windshield had a spider line crack.  On the rear passenger floorboard of the car, Officer Gray found a Davis Industries .380-caliber pistol, a bandana, a red shirt, and several other items. A search revealed no bullet holes or BB pellets inside the car.  However, officers found a dental retainer case labeled "Tomas Ramirez," a CD labeled "Ramirez," and a Kyocera cell phone in the car.

Woodland Police Officer Lewis LeFlore apprehended Reyes shortly after the shooting while Reyes was running in the Yolo Village area.  After handing Reyes over to other police officers for transport, Officer LeFlore drove to the hospital to investigate a report of a gunshot victim.  At Woodland Memorial Hospital, Officer LeFlore found petitioner in the emergency room.  The tips of petitioner's index fingers were nearly severed from his hands, which were darkened in a way consistent with powder burns.  Petitioner's clothes had blood and shards of glass on them.

Officer DeLeon returned to the site of the shooting and found eight shell casings in the street: three from a .45-caliber weapon and five from a .380-caliber weapon.  Delgado's residence had five bullet holes in it.  Officer Gray would later find a .45- caliber Glock semi-automatic pistol about 150 yards from the crashed car.

At 11:14 p.m., petitioner's phone received a text message stating, "At white sudan?  They sed donneley.  They sed ran on feet hit ghost mirror on beamer."  Around 4:00 a.m. the next day, Salas sent a text to petitioner's phone saying, "I think al da homiez got lockd up bro."

Rodriguez owned a Toyota Corolla she had used to give Arismendez a ride to the apartment where he provided the guns to Reyes.  Rodriguez also gave Arismendez a ride the morning after the shooting.  Arismendez had a stomach flu and waited in the car while Rodriguez and her daughter went inside a house.  When Rodriguez came back out, Arismendez was talking to the police.  Eventually, Rodriguez gave Arismendez a ride back to her apartment where he lay down under a blanket.  Soon after, Woodland police officer Thomas Davis knocked on Rodriguez's door and demanded to talk to Arismendez.  Rodriguez initially denied Arismendez was inside, but Arismendez soon came to the door.  Officer Davis arrested Arismendez.

5

The police searched Rodriguez's car and found a .380-firearm magazine containing a bullet in the trunk of her car.  Forensic testing established the magazine was compatible with the .380-pistol found in the car used during the drive-by shooting.  According to Rodriguez, the trunk of her car would not lock and everyone in her neighborhood was aware the trunk was always accessible.

Salas was arrested for stabbing Delgado as he was walking down the street later that day.

A forensic search of Arismendez's phone yielded photographs of a gun and bullets that had been taken with Arismendez's phone.

Woodland police officer Omar Flores testified as an expert on criminal street gangs.  Officer Flores explained the Norteños are a criminal street gang that has adopted signs and symbols as a way of self-identification.  The Norteños' primary purpose is to commit crimes that elicit fear and respect.  Commonly, Norteños commit offenses such as assault and battery, shooting at inhabited dwellings, weapons possession, and attempted murder.  The Norteños and Sureños view each other as enemies and will retaliate when they perceive the rival gang to be disrespectful.  Officer Flores stated that, at the time of the shooting, Arismendez and petitioner were active Norteño gang members and Reyes was an active associate of the gang.  Given a hypothetical situation with facts mirroring the evidence introduced by the prosecution, Officer Flores stated a drive-by shooting would be for the benefit of the Norteño gang.

2.  Defense Case

Jeremy Jamison was called as a witness by Reyes's trial counsel.  Jamison met Ramirez and Moore in the protective custody unit of the county jail in 2012.  Ramirez told Jamison he and Moore had "made up a lot of stuff so that he could get a deal and go home."  Ramirez said he knew all along they were going to a drive-by shooting and he had actually been one of the shooters.  The victim shot back and continued doing so even as the car left the scene.  When Ramirez and Moore realized they could not escape the scene, they came up with a story that they had been carjacked.  Ramirez thought the police "were buying his whole story about being carjacked and all of that and everything until one of the police officers or somebody looked down and seen that he had . . . blood on his pants or shoes or something and that's when they cuffed

him up and took him into custody."  Moore tried to get away by faking a seizure to get an ambulance to take him away.

Jamison relayed this information by writing a letter to the trial judge in October 2012. According to Jamison, the letter found its way to the trial attorneys, who in turn showed it to Ramirez and Moore.  Shortly thereafter, Ramirez and Moore confronted Jamison in jail and threatened to hurt him.  They forced Jamison to write another letter to the judge that stated the first letter had been a forgery.  After writing the second letter, Jamison slit his wrists in an unsuccessful suicide attempt to get away from Ramirez and Moore.

At trial, Jamison testified the first letter had been the truth.  On cross-examination, he acknowledged that he had written letters to judges regarding other inmates' cases.  Jamison further testified he believed "satellite techs" had used wireless technology to take over the brain of his attorney.  Jamison noted the cell phone company Nokia was working on a magnetic ink that could be used for tattoos that subcutaneously alert people to their ringing cell phones.  Jamison suspected this type of technology was being used to control his attorney, who was present in court during his testimony.

C.   Outcome

The jury found petitioner and his co-defendants guilty of conspiracy to commit attempted murder (Pen. Code, § 182, subd. (a)(1)), attempted premeditated murder (§§ 187, 664), and criminal street gang activity (§ 186.22, subd. (a)).  The jury also found true the allegations that the defendants committed the offenses for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)), a principal personally discharged a firearm (§ 12022.53, subd. (e)(1)), and the attempted murder was committed with premeditation (§§ 187, subd. (a), 189, 664).  The trial court subsequently granted the prosecution's motion to dismiss the defendants' convictions for conspiracy to commit attempted murder.  Petitioner and Reyes were also convicted of shooting at an inhabited dwelling. (§ 246.)  The jury found true the allegations that they each personally and intentionally discharged a firearm (§ 12022.5, subd. (a)) and carried a firearm during the commission of a gang-related crime (former § 12021.5, subd. (a); Stats. 2009, ch. 171, § 4).

Petitioner was sentenced to an aggregate term of 35 years to life imprisonment.

1   II.     Post-Conviction Proceedings

2          Petitioner timely appealed, and the California Court of Appeal affirmed the judgment of

3   conviction on November 3, 2015.  Lodged Doc. 23.  The California Supreme Court denied review

4   on January 13, 2016.  Lodged Doc. 25.

5          Petitioner filed a petition for writ of habeas corpus in the California Supreme Court, which

6   was denied on April 12, 2017.  Lodged Docs. 26, 27.

7          STANDARDS GOVERNING HABEAS RELIEF UNDER THE AEDPA

8          28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of

9   1996 ("AEDPA"), provides in relevant part as follows:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

17         The statute applies whenever the state court has denied a federal claim on its merits,

18  whether or not the state court explained its reasons.  Harrington v. Richter, 562 U.S. 86, 99

19  (2011).  State court rejection of a federal claim will be presumed to have been on the merits

20  absent any indication or state-law procedural principles to the contrary.  Id. (citing Harris v. Reed,

21  489 U.S. 255, 265 (1989) (presumption of a merits determination when it is unclear whether a

22  decision appearing to rest on federal grounds was decided on another basis)).  "The presumption

23  may be overcome when there is reason to think some other explanation for the state court's

24  decision is more likely."  Id. at 99-100.

25         The phrase "clearly established Federal law" in § 2254(d)(1) refers to the "governing legal

26  principle or principles" previously articulated by the Supreme Court.  Lockyer v. Andrade, 538

27  U.S. 63, 71-72 (2003).  Only Supreme Court precedent may constitute "clearly established

28  Federal law," but courts may look to circuit law "to ascertain whether…the particular point in

1  issue is clearly established by Supreme Court precedent." Marshall v. Rodgers, 569 U.S. 58, 64
2  (2013).

3        A state court decision is "contrary to" clearly established federal law if the decision
4  "contradicts the governing law set forth in [the Supreme Court's] cases." Williams v. Taylor, 529
5  U.S. 362, 405 (2000). A state court decision "unreasonably applies" federal law "if the state
6  court identifies the correct rule from [the Supreme Court's] cases but unreasonably applies it to
7  the facts of the particular state prisoner's case." Id. at 407-08. It is not enough that the state court
8  was incorrect in the view of the federal habeas court; the state court decision must be objectively
9  unreasonable. Wiggins v. Smith, 539 U.S. 510, 520-21 (2003).

10        Review under § 2254(d) is limited to the record that was before the state court. Cullen v.
11  Pinholster, 563 U.S. 170, 180-181 (2011). The question at this stage is whether the state court
12  reasonably applied clearly established federal law to the facts before it. Id. at 181-182. In other
13  words, the focus of the § 2254(d) inquiry is "on what a state court knew and did." Id. at 182.
14  Where the state court's adjudication is set forth in a reasoned opinion, §2254(d)(1) review is
15  confined to "the state court's actual reasoning" and "actual analysis." Frantz v. Hazey, 533 F.3d
16  724, 738 (9th Cir. 2008) (en banc). A different rule applies where the state court rejects claims
17  summarily, without a reasoned opinion. In Richter, supra, the Supreme Court held that when a
18  state court denies a claim on the merits but without a reasoned opinion, the federal habeas court
19  must determine what arguments or theories may have supported the state court's decision, and
20  subject those arguments or theories to § 2254(d) scrutiny. Richter, 562 U.S. at 102.

21  DISCUSSION

22  I.    Claim One: Refusal to Instruct That Victim Was Also Accomplice

23      A. Petitioner's Allegations and Pertinent State Court Record

24        Petitioner's first claim for relief[3] is that the trial court erroneously refused a defense

25

---

26  [3] The federal petition identifies this issue as the first ground for relief. ECF No. 4 at 7 (Ground
27  One). The petition expressly identifies federal Grounds One and Two, then collectively
   incorporates by reference the claims of the attached exhaustion petition that was filed in the
   California Supreme Court. Id. at 7-8. The answer adopts the numbering of claims from the state
28  petition, in which this claim was sixth. The court here follows the order of the federal petition.

1  request to instruct the jury that Delgado was an accomplice, and that his testimony should

2  therefore be viewed with caution and required corroboration.  ECF No. 4 at 7, 70-84.

3        Jose Delgado was the victim in this case, the Sureño targeted by petitioner and his fellow

4  Norteños.  Casey Moore and Tomas Ramirez, who testified for the prosecution, participated with

5  the defendants in the drive-by.  The trial court gave accomplice instructions, and named Moore

6  and Ramirez as accomplices.  3 CT 720 (CALCRIM 335).  The jury was instructed that, with the

7  exception of these accomplice witnesses, the testimony of any one witness can prove a fact.  3 CT

8  712 (CALCRIM 301).  Counsel for defendant Reyes requested that the accomplice instruction

9  also include Delgado, on the theory that he had provoked the attack.  7 Reporter's Transcript on

10  Appeal ("RT") 1898.  The court acknowledged the evidence of provocation by Delgado, but

11  found that it did not make Delgado an accomplice to the charged crimes and on that basis denied

12  the request.  7 RT at 1899-1900.  Petitioner contends that in the context of the gang rivalry and

13  under the provocative act doctrine, Delgado was an accomplice.  He alleges that refusal of the

14  requested instruction violated his federal rights to a jury trial and due process.  ECF No. 4 at 72.

15        B.  <u>The Clearly Established Federal Law</u>

16        As a general matter, errors in instructing the jury implicate a defendant's constitutional

17  rights only if they "so infect[] the entire trial that the resulting conviction violates due process."

18  <u>Estelle v. McGuire</u>, 502 U.S. 62, 71 (1991).  Alleged instructional error "must be considered in

19  the context of the instructions as a whole and the trial record."  <u>Id.</u> at 72.  In challenging the

20  failure to give an instruction, a habeas petitioner faces an "especially heavy" burden because

21  "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of

22  the law."  <u>Henderson v. Kibbe</u>, 431 U.S. 145, 155 (1977).

23        C.  <u>The State Court's Ruling</u>

24        This claim was raised on direct appeal.  Because the California Supreme Court denied

25  discretionary review, the opinion of the California Court of Appeal constitutes the last reasoned

26  decision on the merits and is the subject of habeas review in this court.  See <u>Ylst v. Nunnemaker</u>,

27  ////

28  ////

1   501 U.S. 797 (1991); <u>Ortiz v. Yates</u>, 704 F.3d 1026, 1034 (9th Cir. 2012).[4]  The appellate court

2   ruled in pertinent part as follows:

3   > Failure to Instruct on Victim's Testimony

4   > Quezada contends the trial court erred in refusing to instruct the
5   > jury that Delgado was an accomplice whose testimony required
    > corroboration. The contention has no merit because a victim of a
    > crime cannot be also an accomplice to the same crime.

6   > A. What Constitutes an Accomplice
7
8   > Section 1111 provides that "[a] conviction cannot be had upon the
    > testimony of an accomplice unless it be corroborated by such other
9   > evidence as shall tend to connect the defendant with the
    > commission of the offense; and the corroboration is not sufficient if
10  > it merely shows the commission of the offense or the circumstances
    > thereof. An accomplice is hereby defined as one who is liable to
11  > prosecution *for the identical offense charged against the defendant*
    > on trial in the cause in which the testimony of the accomplice is
12  > given." (Italics added.) Consequently, " 'an accomplice must stand
    > in the same relation to the crime as the person charged therewith
13  > and must approach it from the same direction.' " (<u>People v. De</u>
    > <u>Paula</u> (1954) 43 Cal.2d 643, 647, quoting <u>People v. Baskins</u> (1946)
14  > 72 Cal.App.2d 728, 731.) Or, to put it another way, an accomplice's
    > "liability as such depends on whether he [or she] promotes,
15  > encourages, or assists the perpetrator and shares the perpetrator's
    > criminal purpose." (<u>People v. Sully</u> (1991) 53 Cal.3d 1195, 1227.)

16  > B. Delgado did not Share the Purpose of the Drive-by Shooting

17  > In this case, Delgado was the victim of a drive-by shooting
    > perpetrated by members of a rival gang. Quezada's argument about
18  > the reciprocal hatred of the Norteño and Sureño criminal street
    > gangs misses the crucial point: Delgado did not intend to commit an
19  > attempted murder of himself for the benefit of a rival gang. As the
    > victim of the attempted murder, Delgado could not have been an
20  > accomplice. Consequently, the trial court properly rejected a
    > request by Delgado's trial attorney to instruct the jury Delgado's
21  > testimony required corroboration as an accomplice to the charged
    > offenses.
22

23  Lodged Doc. 25 at 19-20.

24

25  ─────────────────
    [4] Under AEDPA, when more than one state court has adjudicated the applicant's claim, the
26  federal court looks to the last "reasoned" decision.  <u>Barker v. Fleming</u>, 423 F.3d 1085, 1091 (9th
    Cir. 2005).  Thus, a state supreme court's summary denial of discretionary review, which
27  generally does not state a reason for that denial, is not a "reasoned" decision under AEDPA, and
    this court must "look through" that unexplained decision to the last state court to have provided a
28  "reasoned" decision.  <u>Ylst</u>, 501 U.S. at 806.

D. <u>Objective Unreasonableness Under § 2254(d)</u>

The state court rejected petitioner's claim as a matter of California law, and its resolution of the state law issue is unreviewable here and provides no basis for federal habeas relief.  <u>See</u> <u>Lewis v. Jeffers</u>, 497 U.S. 764, 780 (1990); <u>Bradshaw v. Richey</u>, 546 U.S. 74, 76 (2005).  Even the failure to give a jury instruction which is proper as a matter of state law, without more, does not support federal habeas relief.  <u>Menendez v. Terhune</u>, 422 F.3d 1012, 1029 (9th Cir. 2005) (citing <u>Miller v. Stagner</u>, 757 F.2d 988, 993 (9th Cir. 1985)).

To the extent that the state court's implicit silent rejection of a parallel constitutional claim is subject to review under § 2254, relief is unavailable because the U.S. Supreme Court has never held that a criminal defendant is constitutionally entitled to an instruction limiting the jury's consideration of testimony from an accomplice or from a victim who provoked the crime.  Nor has the U.S. Supreme Court ever announced any related principle that would give petitioner a "clearly established" right to the proposed instruction at issue here.  Where the Supreme Court has not expressly announced the specific constitutional rule on which a petitioner relies for relief, there can be no unreasonable application of clearly established federal law.  <u>Wright v. Van Patten</u>, 552 U.S. 120, 125-26 (2008) (per curiam).  Accordingly, the AEDPA bars relief.

Even without consideration of the AEDPA's statutory limitations on relief, an error in jury instructions violates due process only if that error renders the entire trial and the resulting conviction fundamentally unfair.  <u>See</u> <u>Estelle</u>, 502 U.S at 72.  The record here suggests no fundamental unfairness.  Delgado's testimony was consistent in all material respects with that of the other testifying participants in the underlying events, and with the evidence as a whole. Under any standard of review, therefore, this claim would fail.

II.     <u>Claim Two: Failure to Instruct on Lesser Included Offense</u>

A. <u>Petitioner's Allegations and Pertinent State Court Record</u>

Petitioner alleges that his Sixth and Fourteenth Amendment rights were violated by the trial court's failure to instruct the jury on attempted voluntary manslaughter as a lesser included offense to attempted murder.  ECF No. 4 at 7, 85-100.

////

1      The following exchange took place during discussion of jury instructions:

2              THE COURT: … Let's talk about any other lesser included
        offenses. The only other lesser included offense that's theoretically
3              possible is attempted voluntary manslaughter as a lesser included
        offense to attempted murder, but based on the evidence that's been
4              presented to date, I don't find that there's any justification for
        giving that lesser included instruction.

5

6              Mr. Cobb, Comments?

7              MR. COBB [counsel for petitioner]:  No.

8              THE COURT: Ms. Sequeira, comments?

9              MS. SEQUEIRA [counsel for co-defendant Reyes]:  No.

10             THE COURT: Mr. Toney, comments?

11             MR. TONEY [counsel for co-defendant Arismendez]:  No.

12   7 RT 1910.

13           B.   The Clearly Established Federal Law

14         The U.S. Supreme Court has never held that the Constitution requires a state trial court to

15   instruct a jury on a lesser included offense in a non-capital case.  It is clearly established that a

16   defendant in a capital case has a constitutional right to a jury instruction on a lesser included

17   offense if there is evidence to support the instruction.  Beck v. Alabama, 447 U.S. 625 (1980).

18   The Supreme Court, however, has expressly declined to decide whether this right extends to

19   defendants charged with non-capital offenses.  Id. at 638 n.14.

20         In general, errors in instructing the jury violate due process only where they "so infect[]

21   the entire trial that the resulting conviction violates due process."  Estelle, 502 U.S. at 71.  In

22   challenging the failure to give an instruction, a habeas petitioner faces an "especially heavy"

23   burden because "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a

24   misstatement of the law."  Henderson, 431 U.S. at 155.

25           C.   The State Court's Ruling

26         This issue was presented to and decided by the California Court of Appeal, whose opinion

27   was the last reasoned decision and therefore is subject to scrutiny here.  See Ortiz, 704 F.3d at

28   1034.  The appellate court ruled as follows:

13

Failure to Instruct on Attempted Voluntary Manslaughter

A. The Trial Court's Duty to Instruct the Jury on Lesser Included Offenses

In a criminal trial, the court has a duty to instruct the jury on any offense "necessarily included" in the charged offense if substantial evidence supports a finding of the lesser crime's commission. (People v. Birks (1998) 19 Cal.4th 108, 112.) "[A] lesser offense is necessarily included in a greater offense if either the statutory elements of the greater offense, or the facts actually alleged in the accusatory pleading, include all the elements of the lesser offense, such that the greater cannot be committed without also committing the lesser." (Id. at pp. 117-118.) "This venerable instructional rule ensures that the jury may consider all supportable crimes necessarily included within the charge itself, thus encouraging the most accurate verdict permitted by the pleadings and the evidence." (Ibid.)

The trial court must instruct on lesser included offenses even in the absence of a request so long as a reasonable jury could find the evidence of the lesser offense persuasive. (People v. Lewis (2001) 25 Cal.4th 610, 645.) "Conversely, even on request, the court 'has no duty to instruct on any lesser offense unless there is substantial evidence to support such instruction.'" (People v. Cole (2004) 33 Cal.4th 1158, 1215, quoting People v. Cunningham (2001) 25 Cal.4th 926, 1008.) In assessing a claim of failure to instruct on a lesser included offense, "we review independently the question whether the trial court failed to instruct on a lesser included offense." (Cole, supra, at p. 1215.)

B. Attempted Voluntary Manslaughter

The California Supreme Court has explained, " 'Manslaughter, an unlawful killing without malice, is a lesser included offense of murder.' (People v. Koontz (2002) 27 Cal.4th 1041, 1086; see § 192.) 'Although section 192, subdivision (a), refers to "sudden quarrel or heat of passion," the factor which distinguishes the "heat of passion" form of voluntary manslaughter from murder is provocation.' (People v. Lee (1999) 20 Cal.4th 47, 59; People v. Rios (2000) 23 Cal.4th 450, 461 [certain mitigating circumstances will 'reduce an intentional, unlawful killing from murder to voluntary manslaughter "by negating the element of malice"' (italics omitted)].) 'The provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim [citation], or be conduct reasonably believed by the defendant to have been engaged in by the victim.' (People v. Lee, supra, 20 Cal.4th at p. 59.) '[T]he victim must taunt the defendant or otherwise initiate the provocation.' (People v. Carasi (2008) 44 Cal.4th 1263, 1306; People v. Manriquez (2005) 37 Cal.4th 547, 583-584 (Manriquez).) The ' "heat of passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances. . . ." '; (People v. Steele (2002) 27 Cal.4th 1230, 1252 (Steele).) " '[I]f sufficient time has elapsed for the passions of an ordinarily

14

reasonable person to cool, the killing is murder, not manslaughter."' (<u>People v. Daniels</u> (1991) 52 Cal.3d 815, 868.)" (<u>People v. Avila</u> (2009) 46 Cal.4th 680, 705 (<u>Avila</u>).)

Although attempted voluntary manslaughter is a lesser included offense of attempted murder (<u>People v. Heffington</u> (1973) 32 Cal.App.3d 1, 11), the evidence at trial failed to show provocation by Delgado that could support an attempted voluntary manslaughter conviction. Although Quezada points out Delgado saw himself as a protector of his neighborhood, the record shows the Norteños arrived at the neighborhood with a plan for a drive-by shooting. The evidence showed Delgado was doing nothing more than talking to someone in front of his house when the defendants in this case suddenly opened fire on him. Delgado's conduct was not provocative.

We also reject Quezada's attempt to characterize the evidence as showing Delgado returned fire with a BB gun. First, the evidence showed Delgado got his BB gun only after the defendants' gunfire ended. Moreover, contrary to Quezada's assertion, the reason for the windshield crack is not clear from the record when it shows the same car was involved in a crash and served as the base from which three Norteños launched a hail of gunfire. The fact the window of the Chevrolet was shattered does not establish Delgado provoked the shooting.

Second, even if Delgado had returned fire, this would not constitute a provocative act that would have reduced the attempted murder to attempted voluntary manslaughter. The provocative act must precipitate, not respond to, the attempted homicide. (<u>Avila</u>, <u>supra</u>, 46 Cal.4th at p. 705) We conclude the trial court did not have a duty to give an attempted voluntary manslaughter instruction.

Lodged Doc. 25 at 20-23.

        D.  <u>Objective Unreasonableness Under § 2254(d)</u>

The state court's determination that petitioner was not entitled to the attempted manslaughter instruction under California law is unreviewable here. <u>Bradshaw</u>, 546 U.S. at 76. Nothing in the state law recited and applied by the appellate court contradicts or is inconsistent with any clearly established federal law. Because the U.S. Supreme Court has never recognized a constitutional entitlement to lesser included offense instructions outside the death penalty context, <u>see</u> <u>Beck</u>, <u>supra</u>, no clearly established federal law governs petitioner's claim. <u>See</u> <u>Wright</u>, 552 U.S. at 125-26. In light of the absence of Supreme Court precedent applying <u>Beck</u> to non-capital cases, the Ninth Circuit has expressly held that "the failure of a state court to instruct on a lesser offense [in a non-capital case] fails to present a federal constitutional question and will not be

15

1     considered in a federal habeas corpus proceeding." <u>Solis v. Garcia</u>, 219 F.3d 922, 929 (9th Cir.

2     2000) (per curiam).  This court is bound by <u>Solis</u>, and habeas relief is therefore unavailable.

3         III.      <u>Admission of Gang Evidence</u>

4             A.    <u>Petitioner's Allegations and Pertinent State Court Record</u>

5         The federal petition incorporates by reference the claims contained in the attached petition

6     for writ of habeas corpus that was presented to the California Supreme Court. [5] <u>See</u> ECF No. 4 at

7     8.  Claims One and Three of the state petition both allege that the admission of gang evidence,

8     through the testimony of a gang expert, violated petitioner's constitutional rights.

9         Claim One of the state petition alleges that "highly prejudicial and inflammatory evidence

10     of gang crimes, history of street and prison gangs and crimes irrelevant to the underlying facts of

11     the case" violated petitioner's Sixth and Fourteenth Amendment rights.  ECF No. 4 at 12.

12     Petitioner contends that this evidence of gang violence, introduced primarily through the expert

13     testimony of Officer Flores, was intended to show petitioner's criminal disposition and bad

14     character (i.e., functioned impermissibly as propensity evidence), and inflamed the jury against

15     him.  He argues that the evidence of gang violence independent of the charged crimes rendered

16     the trial fundamentally unfair.  ECF No. 4 at 16-25.

17         Claim Three of the state petition alleges that the trial court abused its discretion when it

18     denied a defense motion in limine to exclude the prejudicial gang evidence at issue in Claim One.

19     ECF No. 4 at 40-41.  Petitioner's argument regarding the impermissible use of propensity

20     evidence and prejudicial effect of gang evidence, <u>id.</u> at 40-45, overlaps almost entirely with the

21     argument presented in support of Claim One.  The record reflects that co-defendant Reyes

22     brought a motion in limine, which petitioner joined, not to exclude but to limit the testimony of

23     the prosecution's gang expert pursuant to Section 352 of the California Evidence Code, to prevent

24     unreliable, confusing and prejudicial evidence of gang culture and activity generally.  2 CT 525-

---

25     [5]  Each claim of the state petition, including Claims One and Three, contains a subsection alleging

26     ineffective assistance of appellate counsel in failing to present the issue on direct appeal.  Each of
these appellate ineffectiveness arguments is expressly asserted in an attempt to defeat imposition

27     of procedural defaults, and not as freestanding claims for relief.  The California Supreme Court
denied the petition on the merits, without relying on any procedural bar.  Accordingly, this court

28     need not address the assertions of ineffective assistance of counsel on appeal.

526. At hearing on the in limine motions, the court stated that it would take up objections to specific testimony from the gang expert during the presentation of evidence.  1 RT 55-57.

### B.  The Clearly Established Federal Law

The admission of evidence is governed by state law, and habeas relief does not lie for errors of state law.  Estelle, 502 U.S. at 67.  The erroneous admission of evidence violates due process, and thus supports federal habeas relief, only when it results in the denial of a fundamentally fair trial.  Id. at 72.  The Supreme Court has rejected the argument that due process necessarily requires the exclusion of prejudicial or unreliable evidence.  See Spencer v. Texas, 385 U.S. 554, 563-564 (1967); Perry v. New Hampshire, 565 U.S. 228, 245 (2012).

### C.  The State Court's Ruling

Because the California Supreme Court denied the state habeas petition on the merits without comment or citation, and there is no reasoned opinion from a lower court, this court asks whether there is any reasonable basis for the state court's decision in light of the clearly established federal law.  Richter, 562 U.S. at 102.

### D.  Objective Reasonableness Under § 2254(d)

Petitioner's challenge to the trial court's exercise of its discretion under the California Evidence Code fails to present a cognizable claim for federal habeas relief.  See Estelle, 502 U.S. at 67.  To the extent these claims are independently predicated on a federal due process theory, habeas relief is barred by AEDPA because no clearly established federal law provides that the admission of prejudicial evidence violates due process.  Where no clearly established federal law supports petitioner's claim, the state court cannot have ruled unreasonably.  See Wright, 552 U.S. at 125-26.  Because the Supreme Court has never found due process violated by the admission and use of prejudicial evidence, including bad acts or propensity evidence, the Ninth Circuit has repeatedly rejected claims similar to the one presented here.  See Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009); Alberni v. McDaniel, 458 F.3d 860, 866 (9th Cir. 2006), cert. denied, 549 U.S. 1287 (2007).  Relief is unavailable on this claim.

////

////

17

1    IV.    Ineffective Assistance of Trial Counsel

2           A.    Petitioner's Allegations and Pertinent State Court Record

3           Claim Two of the state habeas petition alleges that trial counsel was ineffective in failing

4    to retain a gang expert to refute the testimony of Officer Flores.  ECF No. 4 at 30-37.

5           B.    The Clearly Established Federal Law

6           To establish a constitutional violation based on ineffective assistance of counsel, a

7    petitioner must show (1) that counsel's representation fell below an objective standard of

8    reasonableness, and (2) that counsel's deficient performance prejudiced the defense.  Strickland v.

9    Washington, 466 U.S. 668, 692, 694 (1984).  Prejudice means that the error actually had an

10   adverse effect on the defense.  There must be a reasonable probability that, but for counsel's

11   errors, the result of the proceeding would have been different.  Id. at 693-94.  The court need not

12   address both prongs of the Strickland test if the petitioner's showing is insufficient as to one

13   prong.  Id. at 697.  "If it is easier to dispose of an ineffectiveness claim on the ground of lack of

14   sufficient prejudice, which we expect will often be so, that course should be followed."  Id.

15          C.    The State Court's Ruling

16          This claim was summarily denied by the California Supreme Court in habeas.

17          D.    Objective Reasonableness Under § 2254(d)

18          When a California court summarily denies habeas relief without issuing an order to show

19   cause, it has determined that petitioner failed to state a prima facie case, and the absence of a

20   prima facie case is the determination that must be reviewed for reasonableness under § 2254(d).

21   See Nunes v. Mueller, 350 F.3d 1045, 1054-55 (9th Cir. 2003), cert. denied, 543 U.S. 1038

22   (2004).  Under Strickland, a petitioner must plead and eventually prove both deficient

23   performance and prejudice from counsel's errors or omission—and the latter requires at least a

24   proffer of specific evidence that could have been discovered and presented and would likely have

25   changed the outcome of the trial.  See Wildman v. Johnson, 261 F.3d 832, 839 (9th Cir. 2001) (no

26   ineffective assistance of counsel for failing to retain expert where petitioner did not offer

27   evidence that expert would have testified); Grisby v. Blodgett, 130 F.3d 365, 373 (9th Cir. 1997)

28   (speculation about unpresented evidence, including expert testimony, is not enough to establish

prejudice from ineffective assistance); Hendricks v. Calderon, 70 F.3d 1032, 1042 (1995) (absent a specific account of what beneficial evidence would have been revealed by further investigation, petitioner cannot meet the prejudice prong of Strickland).  The petition before the state court contained no such showing.  Petitioner relies solely on speculation about the testimony a defense expert may have been able to provide.  Accordingly, there was nothing objectively unreasonable about the conclusion that petitioner had failed to establish a prima facie case under Strickland.  Section 2254(d) accordingly bars relief.

V.      Sufficiency of the Evidence as to Gang Allegations

A.  Petitioner's Allegations and Pertinent State Court Record

Claim Four of the state habeas petition alleges that the criminal street gang allegations were unsupported by constitutionally sufficient evidence.  ECF No. 4 at 53-60.

B.  The Clearly Established Federal Law

Due process requires that each essential element of a criminal offense be proven beyond a reasonable doubt.  United States v. Winship, 397 U.S. 358, 364 (1970).  In reviewing the sufficiency of evidence to support a conviction, the question is "whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319 (1974).  If the evidence supports conflicting inferences, the reviewing court must presume "that the trier of fact resolved any such conflicts in favor of the prosecution," and the court must "defer to that resolution."  Id. at 326.  "A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury."  Cavazos v. Smith, 565 U.S. 1, 2 (2011).  A verdict must stand unless it was "so unsupportable as to fall below the threshold of bare rationality."  Coleman v. Johnson, 566 U.S. 650, 656 (2012).  In applying these principles, a court looks to state law for the substantive elements of the criminal offense, but the minimum amount of evidence that the Constitution requires to prove the offense "is purely a matter of federal law."  Id. at 655.

C.  The State Court's Ruling

This claim was summarily denied by the California Supreme Court in habeas.

19

1        D.  Objective Unreasonableness Under § 2254(d)

2        The summary rejection of this claim was not unreasonable under Jackson v. Virginia,

3  supra.  California Penal Code § 186.22(b)(1) requires that the prosecution prove a felony was (1)

4  "committed for the benefit of, at the direction of, or in association with any criminal street gang"

5  and (2) "with the specific intent to promote, further, or assist in any criminal conduct by gang

6  members."  Emery v. Clark, 643 F.3d 1210, 1214 (9th Cir. 2011).  Petitioner contends primarily

7  that the evidence did not support a finding that the shooting was committed "for the benefit of"

8  the gang, because there was testimony that the Norteños prohibit drive-by shootings.  This court

9  is bound by the California Supreme Court's interpretation of the statutory language.  See

10  Bradshaw, 546 U.S. at 76.  In People v. Alibar, 51 Cal.4th 47, 63-64 (2010), the state court held

11  that criminal conduct can be "for the benefit of" a gang even when inconsistent with the tenets of

12  the gang.  Measuring the evidence at trial against the elements of § 186.22(b)(1), there is nothing

13  unreasonable about the state court's rejection of this claim.

14        Petitioner disagrees with the jury's evaluation of the evidence, but this is far from a case

15  in which "no rational trier of fact could have agreed with the jury."  Cavazos, 565 U.S. at 2.

16  There was extensive evidence of petitioner's own gang involvement, a gang-related motivation

17  for the shooting, and expert opinion testimony that the drive-by would benefit the Norteños as a

18  whole by instilling fear in their enemies and would also increase the status of participants within

19  the gang.  Particularly in light of the "double dose of deference" to the verdict that is required

20  under the Due Process Clause and the AEDPA, Boyer v. Belleque, 659 F.3d 957, 964 (9th Cir.

21  2011), federal habeas relief is unavailable on this claim.

22    VI.    Reliance on Accomplice Testimony

23        A.  Petitioner's Allegations and Pertinent State Court Record

24        Claim Five of the state petition alleges that petitioner was convicted solely on the basis of

25  accomplice testimony in violation of due process.  His due process theory rests on California law

26  limiting the uses of accomplice testimony, Cal. Penal Code § 1111, which petitioner argues

27  creates a protected liberty interest.  ECF No. 4 at 64-68.

28  ////

1        B.  The Clearly Established Federal Law

2        The U.S. Supreme Court has never held that the constitution requires corroboration of

3 accomplice testimony, or that state evidentiary rules create liberty interests to which a criminal

4 defendant is entitled as a matter of due process.  State law governing the admission of evidence

5 and its consideration by the jury implicates due process only when the entire trial is infected by

6 fundamental unfairness.  Estelle, 502 U.S. at 72.

7        C.  The State Court's Ruling

8        This claim was summarily denied by the California Supreme Court in habeas.

9        D.  Objective Unreasonableness Under § 2254(d)

10        Petitioner cannot transform a state law issue into a federal one by merely invoking due

11 process.  Langford v. Day, 110 F.3d 1380, 1389 (9th Cir. 1996).  The Ninth Circuit has squarely

12 held that Cal. Penal Code § 1111 is a state statutory rule that is not compelled by the Constitution

13 or federal law, and that federal habeas claims based on violations of that section are therefore not

14 cognizable.  Laboa v. Calderon, 224 F.3d 972, 979 (9th Cir. 2000).  To the extent that petitioner

15 argues the absence of corroborating evidence rendered his trial fundamentally unfair within the

16 meaning of Estelle and progeny, the state court's rejection of the claim was not unreasonable.

17 The evidentiary record included an abundance of both direct and circumstantial evidence of

18 petitioner's involvement in the charged crimes from accomplices and non-accomplices alike.

19 There is no basis for relief.

20                              CONCLUSION

21        For all the reasons explained above, the state courts' denial of petitioner's claims was not

22 objectively unreasonable within the meaning of 28 U.S.C. § 2254(d).  Even without reference to

23 AEDPA standards, petitioner has not established any violation of his constitutional rights.

24 Accordingly, IT IS HEREBY RECOMMENDED that the petition for writ of habeas corpus be

25 denied and that the court decline to issue a certificate of appealability under 28 U.S.C. §

26 2253(c)(2).

27        These findings and recommendations are submitted to the United States District Judge

28 assigned to the case, pursuant to the provisions of 28 U.S.C. §636(b)(l).  Within twenty-one days

after being served with these findings and recommendations, any party may file written

objections with the court and serve a copy on all parties.  Such a document should be captioned

"Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

shall be served and filed within fourteen days after service of the objections.  The parties are

advised that failure to file objections within the specified time may waive the right to appeal the

District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: March 31, 2023

ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE